## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

ALBERT G. HILL, III and ERIN N. HILL          Civil Action No.  3:20-cv-3250
                       Plaintiffs,

      vs.

COUNTY OF DALLAS, TX; CRAIG WATKINS;
TERRI MOORE; DONNA STRITTMATTER;
STEPHANIE MARTIN; RUSSELL WILSON; LISA
BLUE; the ESTATE of ALBERT G. HILL, JR.;
MARGARET KELIHER, as Adminstrator of the
STATE OF ALBERT G. HILL, JR.; CHARLA
ALDOUS; STEPHEN MALOUF; MICHAEL
LYNN; JEFFREY TILLOTSON; DAVID
PICKETT; MICHAEL GIBSON; and JOHN and
JANE DOE Assistant District Attorneys
                       Defendants.

## COMPLAINT

Plaintiffs, Albert G. Hill, III and Erin N. Hill ("Plaintiffs" or "Mr. and Mrs. Hill"), by their

attorneys, The Skepnek Law Firm and Lathrop GPM LLP, hereby allege as follows:

## INTRODUCTION

*The record supports a conclusion that an objectively reasonable prosecutor under circumstances similar to those presented here would likely be improperly influenced. While political contributions within statutory limits are both lawful and regular, the concern here is not with Hill's father's counsel and Blue's decisions to support Watkins's campaign or promote his career, which they had every right to do. Rather, the concern is with the prosecutor himself and his apparent eagerness to curry Blue's favor, even going so far as to explicitly suggest "[t]here could be an indictment or are you still interested;" while knowing of the ongoing $50 million fee dispute between Blue and Hill. Further, Watkins was alerted to the alleged mortgage fraud by Hill's father, rather than a crime victim, and the record contains the testimony of career prosecutors, whom the record does not reflect solicited or otherwise received improper influence, as to the tenuous nature of the case against Hill. From these facts, I agree with the majority that the trial judge could have readily based her decision on the grounds of vindictive prosecution and conflict*

> *of interest, given the competing interest of which Watkins appears to have been solicitous. But I believe that the due process violation as recognized in Massey Coal could serve as an independent and direct ground for dismissal. See Massey Coal, 556 U.S. at 886. A reasonable prosecutor, knowing of the facts known to Watkins prior to the time he approached the grand jury seeking the indictments, would have recognized he harbored a disposition of a kind that a fair-minded person could not set aside.*
> *--August 15, 2018 Concurring Opinion on Remand from Judge Schenck, Court of Appeals, Fifth District of Texas at Dallas, in Case No. 05-13-00421-CR.*

1.    This case is about public corruption.  It exposes naked political corruption in the criminal justice system in Dallas County, Texas.  It illustrates how wealthy and politically connected people can get favors from prosecutors in return for political support and campaign contributions.  In this case, Texas appellate court findings show how the Dallas County District Attorney, and his office, were used to obtain vengeance by a wealthy and politically-connected father against his son and his son's wife in retaliation for their efforts to protect their rights and the rights of their children to inheritance from a family trust.

2.    To obtain prosecution of trumped-up charges against his son, the father (Albert G. Hill, Jr.) made political contributions to elected Dallas County District Attorney Craig Watkins. These contributions were quid pro quo for Watkins to bring the criminal indictments against his son (Albert G. Hill, III referred herein as "Mr. Hill") and daughter-in-law (Erin Nance Hill referred herein as "Mrs. Hill") that the father wanted.  These desired indictments were part of a scheme through which the father planned to reclaim an inheritance the son had succeeded in vindicating in a federal court action, to obtain legal custody of the Hills' three minor children, and to exact retribution for Mr. Hill's perceived airing of the family's financial dealings.

3.    In addition to using his state power for private personal matters in exchange for money from Al Hill, Jr., the District Attorney was simultaneously approached by a wealthy, and

politically-connected lawyer (Lisa Blue) who had historically provided him with substantial political and financial support.  Blue was calling in a favor and requesting that the District Attorney help her collect more than fifty million dollars she was seeking from a former client—plaintiff in this case, Albert Hill, III ("Mr. Hill").  Using information Blue gained while representing Mr. Hill, Blue wanted the DA to criminally indict him on the eve of trial over the $50 million fee dispute.

4.       When Mr. Hill exposed this corruption to Judge Lena Levario of the Dallas County District Court, the judge expeditiously held evidentiary hearings, at which both Watkins and Blue refused to testify despite being subpoenaed to do so, considered the evidence of the corrupt use of state prosecutorial power, and dismissed the indictments against Mr. Hill.  Blue and District Attorney Watkins then brazenly retaliated against Judge Levario by promoting and funding the campaign of one of the District Attorney's assistants to unseat the judge.   They succeeded and Judge Levario was removed from the bench.

5.       Ultimately, the Texas Court of Criminal Appeals affirmed the findings of Judge Levario. On remand from the Court of Criminal Appeals, the Fifth Court of Appeals in Dallas reiterated the finding of prosecutorial misconduct in bringing the indictments and finally dismissed the charges on October 26, 2018.  Damages from the prosecutorial misconduct against Mr. and Mrs. Hill include tens of millions of dollars in legal fees (in both criminal and civil lawsuits) as well as adverse impacts on litigation in other civil claims, including in the pending litigation with Blue over attorneys' fees.

6.       In 2014, Watkins was voted out of office after a string of financial scandals including using seized money for personal expense and diverting campaign funds to personal use. In 2010, when Blue was Mr. and Mrs. Hill's attorney, she had bragged that she put Watkins in office and could call on his favors at any time.  When Mr. Hill's father first sought to enlist the

DA's help in creating criminal leverage over Mr. Hill, Blue assured Mr. Hill that she could control what happened at the DA's office.  But after a falling out, when she had quit representing him, and sued him over her $50 million demand for attorneys' fees, Blue switched sides and used the same leverage with Watkins to her benefit in the fee dispute with Mr. Hill.

7.    Finally, the concerted actions of the father (Albert G. Hill, Jr.), the son's lawyer (Lisa Blue), and the District Attorney (Craig Watkins) have forced Mr. Hill to uproot his family and leave Texas, and has caused him to suffer severe mental and emotional distress, directly and adversely impacting his physical health.  Mr. Hill's wife and their children have suffered similarly.

8.    While Mr. Hill and his family have a right to justice and fair compensation for their claims, the public also has a right to root out corruption in our justice system.  Mr. Hill and his family should be compensated for what they have lost, but perhaps, even maybe more importantly, there should be consequences for public officials who sell the power of their office and political power brokers who "call in favors" from politicians they have put in office.

## JURISDICTION AND VENUE

9.    This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of state law of Plaintiffs' rights as secured by the United States Constitution.

10.    This court has subject matter jurisdiction of this action under 28 U.S.C. § 1331 because all claims arise under 42 U.S.C. § 1983.

11.    This Court has personal jurisdiction over Defendant Dallas County because it is a governmental entity and therefore resides in Texas and/or transacts business in the State of Texas, such that this Court's exercise of personal jurisdiction over Defendant is consistent with all applicable statutory requirements and constitutional guarantees.

12.     This Court has personal jurisdiction over Defendants Craig Watkins, Terri Moore, Donna Strittmatter, Stephanie Martin, Russell Wilson, Lisa Blue, the Estate of Albert G. Hill, Jr., Charla Aldous, Stephen Malouf, Michael Lynn, Jeffrey Tillotson, and David Pickett because they reside in Texas and/or transact business in the State of Texas, such that this Court's exercise of personal jurisdiction over the Defendants is consistent with all applicable statutory requirements and constitutional guarantees.

13.     Venue is proper under 28 U.S.C. § 1391(b) and (c).  On information and belief, all Defendants in this action reside in Dallas County, Texas, and the events giving rise to the claims asserted in this complaint all occurred within this District.

## THE PARTIES

14.     Plaintiff **Albert G. Hill, III** ("Mr. Hill") was, at all times relevant to this complaint, a citizen of Dallas County, Texas and son of the late Albert G. Hill, Jr.  After the events alleged in this complaint, Al III relocated to Atlanta, Georgia where he currently resides.

15.     Plaintiff **Erin N. Hill** ("Mrs. Hill") was, at all times relevant to this complaint, a citizen of Dallas County, Texas.  After the events alleged in this complaint, Erin relocated with her husband, Hill, III, to Atlanta, Georgia where she currently resides.

16.     Defendant **County of Dallas, TX** is a political subdivision of the State of Texas, was the employer of Defendants Moore, Strittmatter, Martin, Wilson, and John and Jane Doe ADA's and Supervisors and is and was at all times relevant to this complaint responsible for the policies, practices, and customs of the Dallas County District Attorney's Office ("DCDA" or "Dallas County").

17.     Defendant **Craig Watkins** at all times relevant to this complaint was the duly elected and acting District Attorney of the DCDA, acting under color of law pursuant to the

statutes, ordinances, regulations, policies, customs, and usage of Dallas County and the State of Texas. He is sued in his official and individual capacities.

18.    Defendant **Terri Moore** was, at all times relevant to this complaint an Assistant District Attorney of Dallas County acting within the scope of her employment and under color of state law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Dallas County, Texas. She is sued in her individual capacity.

19.    Defendant **Donna Strittmatter** as, at all times relevant to this complaint, an Assistant District Attorney of Dallas County acting within the scope of her employment and under color of state law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Dallas County, Texas. She is sued in her individual capacity.

20.    Defendant **Stephanie Martin** was, at all times relevant to this complaint, an Assistant District Attorney of Dallas County acting within the scope of her employment and under color of state law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Dallas County, Texas. She is sued in her individual capacity.

21.    Defendant **Russell Wilson** was, at all times relevant to this complaint, an Assistant District Attorney of Dallas County acting within the scope of his employment and under color of state law pursuant to statutes, ordinances, regulations, policies, customs, and usage of Dallas County, Texas. He is sued in his individual capacity.

22.    Defendants Watkins, Moore, Strittmatter, Martin, and Wilson will sometimes be referred to, collectively, as "DCDA Defendants."

23.    Defendant **Lisa Blue** is a citizen and resident of Dallas County, Texas.

24.    Defendant **Albert G. Hill, Jr.** ("Hill Jr.") was a citizen and resident of Dallas County, Texas until his death in 2017. Claims against Hill Jr. are brought against his estate.

25.    Defendant **Margaret Kehiler** is a citizen of Dallas County, Texas, and is sued solely in her capacity as Administrator of the Estate of Albert G. Hill, Jr.

26.    Defendant **Charla Aldous** is a citizen and resident of Dallas County, Texas.

27.    Defendant **Stephan Malouf** is a citizen and resident of Dallas County, Texas.

28.    Defendant **Michael Lynn i**s a citizen and resident of Dallas County, Texas.

29.    Defendant **Jeffrey Tillotson** is a citizen and resident of Dallas County, Texas.

30.    Defendant **David Pickett** is a citizen and resident of Dallas County, Texas.

31.    Defendant **Michael Gibson** is a citizen and resident of Dallas County, Texas.

32.    Defendants Blue, Hill Jr., Aldous, Malouf, Lynn, Tillotson, Pickett, and Gibson (sometimes referred to as the "Private Citizen Defendants") are liable under 42 § U.S.C. 1983 for—as shown below—conspiring with the District Attorney, Assistant District Attorneys, the DCDA, and/or other state actors to violate Plaintiffs' civil rights. *See Brummett v. Camble*, 946 F.2d 1178, 1185 (5th Cir. 1991).

## FACTS

### A. The Trust Litigation

33.    Plaintiff Albert G. Hill, III ("Mr. Hill") is a great-grandson of H.L. Hunt.  His father was Albert G. Hill, Jr. ("Hill Jr"), who died in 2017.  Plaintiff Erin Nance Hill ("Mrs. Hill") is his wife.  On February 18, 2010, Mr. and Mrs. Hill and their three minor children, Albert Galatyn Hill IV, Nance Haroldson Hill, and Caroline Margaret Hill, lived at 4433 Bordeaux Avenue, Highland Park, Texas ("Plaintiffs' Residence").

34.    Before his death, H.L. Hunt had established family trusts in the names of his two eldest children, the Margaret Hunt Trust Estate and the H.L. Hunt, Jr. Trust Estate.  Margaret Hunt had three children, including Hill Jr., who in turn, also had three children — one of whom is Mr.

Hill. Because H.L. Hunt, Jr. had no children, Margaret Hunt's three children and grandchildren (including Mr. Hill) became the beneficiaries of both trusts.

35.     After his grandmother, Margaret, died in 2007, believing he had become a vested beneficiary of the trusts, Mr. Hill asked Hill Jr. for an accounting of trust assets. What followed is similar, though far less humorous, to what happened to the fictional character Louis Winthorpe III, played by actor Dan Aykroyd, in the 1983 movie *Trading Places*. The response of Hill Jr. to Mr. Hill's request for an accounting was that Mr. Hill was fired from his job with a family-owned company and deprived of all access to his accustomed financial resources.

36.     Despite being cut-off from family resources, Mr. Hill persevered and in December 2007, initiated litigation against Hill Jr. and other Hunt family members alleging various forms of wrongdoing in the management of the trusts, and seeking, *inter alia*, a declaration that he was a direct and vested beneficiary (the "Hunt Trust Litigation"). That case was removed to the United States District Court for the Northern District of Texas and assigned to Hon. Reed O'Connor. The trust interests at issue were worth more than $1 billion, and Mr. Hill's vested interest was worth more than $100 million.

37.     In November 2009, Mr. Hill hired Lisa Blue, Charla Aldous, and Stephen Malouf (collectively, "BAM") to represent him in the Hunt Trust Litigation. The BAM lawyers had a well-established reputation of success in high-profile litigation.

38.     On February 18, 2010, Judge O'Connor entered an order in the Hunt Trust Litigation finding that Hill Jr. had testified falsely and had submitted, in bad faith, falsified evidence in connection with the Hunt Trust Litigation. Judge O'Connor also found that arguments made by Hill Jr.'s lawyer, Defendant Michael Lynn ("Lynn"), had "far exceeded the bounds of advocacy, permissible or otherwise."

39.     Judge O'Connor's ruling was a sea change in the litigation, and was substantially harmful to Hill Jr., and just as helpful to Mr. Hill.   Following Judge O'Connor's ruling it seemed probable that Mr. Hill would win the case.

**B. Hill Jr. Conspires to Have Charges Filed**

40.     Angered and embarrassed by Judge O'Connor's perjury findings, Hill Jr. began implementing a scheme to punish Mr. and Mrs. Hill, to gain financial advantage over them and deprive them of their children.   To achieve this end, Hill Jr. determined that he would induce Dallas County District Attorney Craig Watkins to indict Mr. and Mrs. Hill on trumped-up criminal charges, and then take custody of their children.

41.     Four days after Judge O'Connor's February 18 order, Hill Jr. directed his lawyers (Defendants Michael Lynn and Michael Gibson) to make a written submission to the Dallas County District Attorney's office dated February 22, 2010.   That submission, which contained false and misleading information, was made on behalf of Hill Jr., and he (along with Lynn and Gibson) is fully responsible for its contents, as demonstrated in part by the introduction to the submission itself, which states: "Albert G. Hill, Jr. complains of his son, Albert G. Hill, III . . . ."

42.     Lynn was more than happy to deliver this referral since, at the time, he harbored his own animus and malice towards Mr. Hill, based on Mr. Hill's role in exposing Lynn's involvement in suborning perjury.   Although Lynn is an attorney, delivery of this submission to the District Attorney's office did not require a law license or any legal expertise.   In fact, submitting a criminal referral to the District Attorney and lobbying for an indictment is expressly outside the scope of any appropriate legal representation in which Lynn could have permissibly been engaged as Hill Jr.'s lawyer in civil litigation.

43.     Just a day or two prior to this submission, when Mr. Hill refused one of Hill Jr.'s demands, Hill Jr. told him he would "see him in jail," which serves to highlight the malice and lack of probable cause that motivated the criminal referral.  Hill Jr.'s ill will against his son is further shown by a remarkable pleading that Hill Jr. filed against Mr. Hill in Dallas County on the same day as this submission to the District Attorney's office in which Hill Jr. labelled his own son "the apostate"; compared him to Lucifer; called him a sociopath; ridiculed him for reading the Bible; and viciously insulted Mrs. Hill and her parents.

44.     Motivated by this malicious intent, Hill Jr. further directed Defendant David Pickett, who was by then the trustee of the Albert Hill Trust, to make a similar written submission to the District Attorney's office dated April 14, 2010.  That written statement reiterated the same false assertions contained in the submission from February 22, 2010.  Although the District Attorney's office misplaced that written submission for a period of time, it was ultimately found (or recreated), and the information in it (and in the February 2010 submission) formed the pretext of the indictments ultimately issued against Plaintiffs in March and April of 2011.  This submission and subsequent efforts by Pickett to bring about Plaintiffs' prosecution were undertaken by Pickett in his role as trustee of the Albert Hill Trust, and not as an attorney for Hill Jr.

45.     In addition, Hill Jr., Lynn, and Pickett (at Hill Jr.'s direction and for their own reasons) personally met with and orally conveyed information to representatives of the District Attorney's office on one or more occasions and repeated to prosecutors the false information contained in the above-referenced written submissions.

46.     In an attempt to lend legitimacy to his malicious attempts to get Plaintiffs indicted on false charges, Hill Jr. (acting directly and through Lynn and Pickett) touted to District Attorney Watkins the fact that, in 2004, Mr. and Mrs. Hill had entered into a Real Estate Sales Contract

purporting to convey to the "Albert Hill Trust" an 80% undivided interest in the Plaintiffs'
Residence. Hill Jr. was at the time a beneficiary of that trust (and Mr. Hill was a remainder
beneficiary), and Ivan Irwin, Jr. was its trustee. It is this alleged conveyance that, according to
Hill Jr., Lynn, and Pickett (and later the indictments), rendered false Plaintiffs' representations in
their loan application about the ownership of Plaintiffs' Residence.

47.    But, as Hill Jr., Pickett, and Lynn knew, and as Watkins and his staff also knew or
could have easily learned through minimal investigation, this purported transaction was not a real
conveyance, as demonstrated in part by the fact that the deed supposedly conveying an 80%
interest to the trust was not recorded in the real property records. In fact, the alleged transaction
was intended in 2004 as an advance to Mr. Hill on expected inheritances. As known by Hill Jr.,
Pickett, Lynn, Gibson, and as Watkins and his staff also knew or could have easily learned through
minimal investigation, it was illegal and unenforceable under Texas law to the extent it purported
to encumber the Plaintiffs' Residence. As a matter of Texas law, the existence of this purported
transaction did not diminish the 100% interest in the property owned by Plaintiffs, as was in part
shown by the lender, OmniAmerican Bank's, decision, made with knowledge of the alleged
transaction, to accept Plaintiffs' loan application and to loan them $500,000.

48.    The submission of these false reports to the District Attorney's office constituted
the "initiation" of a criminal prosecution against Plaintiffs because they consisted of formal
charges to law enforcement authorities and constituted the making of charges before a public
official or body in such a form as to require the official or body to determine whether to issue
process against the accused. Alternatively, by submitting these false reports, Hill Jr., Lynn, and
Pickett "procured" criminal charges against Mr. and Mrs. Hill, inasmuch as, but for these false
reports, the prosecution would never have occurred. The fact that the DA's office temporarily lost

Pickett's submission is of no importance, in part because Pickett orally conveyed to the District Attorney's office the same false information that was in his written submission, because the lost submission was later found or recreated, and because the substance of the false information from the Pickett submission clearly made its way into the "pitch session," described in more detail below.

49.     In a filing on February 6, 2013, in the criminal case (signed by Defendant Russell Wilson), the State of Texas admitted and represented to the court that the criminal prosecution of Plaintiffs was indeed premised on and initiated by the February and April 2010 submissions of Lynn, Pickett, and Gibson and that the State unquestionably relied on both submissions.  In fact, the State went so far as to suggest that it gave special weight to Lynn's submission given his "prominence" in the Dallas legal community.

50.     Moreover, Lynn's, Gibson's, and Pickett's status as lawyers provide them no immunity from the consequences of making these false reports of criminal conduct.  In making these submissions to the District Attorney's office, and in following up on the submissions with a campaign of undue pressure to prosecute, Pickett was acting as a trustee of the Albert G. Hill Trust and/or as a business advisor to Hill Jr. (and not as a lawyer).  Lynn, for his part, was acting in part out of personal animosity to Mr. Hill.  And, in any event, the submissions made by Lynn, Pickett, and Gibson reporting alleged criminal activity to the District Attorney were not filings in any pending litigation in which they were representing Hill Jr., required no legal training or involvement, and are not the actions normally taken by attorneys in representing clients.

51.     Hill Jr. was not content to rely on these false reports alone to ensure that Mr. and Mrs. Hill would be indicted.  After their submissions, Hill Jr. exerted continuous pressure on District Attorney Watkins and his staff to get indictments against Mr. Hill on file.  Hill Jr.'s

pressure tactics included having Pickett bombard the District Attorney's office with written and oral demands for indictments; causing Hill Jr.'s lawyers (Lynn, Pickett, and Tillotson) and family members to make substantial (and for them unprecedented) campaign contributions to the District Attorney; causing Hill Jr.'s family members to make contributions to fund programs at the District Attorney's office (or supported by the District Attorney) that were then used by the District Attorney to burnish his public image; and making arrangements to facilitate the hiring of one of Hill Jr.'s own private lawyers (Defendant Wilson who had worked in Gibson's firm) as a special prosecutor at the District Attorney's office to help spearhead the criminal case against Mr. Hill. All of this additional activity was part of the process through which these indictments were initiated and procured and through which Watkins was influenced and essentially bribed.

52.     Hill Jr.'s scheme to torment his son and daughter-in-law with false criminal charges was made easier by the fact that District Attorney Craig Watkins was more than open to the kind of undue pressure that Hill Jr. and others were exerting. But, not content to rely just on the tactics described above, Hill Jr. escalated, in late 2010 or early 2011 (and perhaps earlier), his efforts to secure his son's indictment by enlisting the help of an unlikely ally in Mr. Hill's former attorney, Lisa Blue.

## C. The Fee Dispute with the BAM Lawyers and Lisa Blue's Involvement in the Plaintiffs' Criminal Charges

53.     Until late 2010, Lisa Blue, who had close and untoward ties to the District Attorney, represented Mr. Hill in various lawsuits, including the Hunt Trust Litigation. During that representation, she bragged to Mr. Hill (and to her co-counsel) that she controlled District Attorney Watkins and could call on him at will to exert pressure on others that could potentially benefit Mr. Hill.

54.     Having been deprived of his sources of income and to support his family during the prolonged (and costly) Hunt Trust Litigation, Mr. Hill was forced to borrow money and was loaned $300,000 by the BAM lawyers.

55.     After they had already undertaken the representation, and knowing that it was then likely Mr. Hill would prevail in the Hunt Trust Litigation, having already received significant settlement offers, and that Mr. Hill and his children would soon be receiving distributions from the trusts in excess of $100,000,000, the BAM lawyers pressured Mr. Hill to give them a contingency fee interest in his recovery.

56.     In May 2010, under pressure from the BAM lawyers who threatened to withdraw from Mr. Hill's case and put him into bankruptcy using their claim that he owed them $300,000, Mr. Hill agreed to settle his claims in the Hunt Trust Litigation.  The Global Settlement and Mutual Release Agreement was dated May 14, 2010 and filed in the litigation as Document 879.

57.     After Mr. Hill entered into the settlement agreement, the BAM lawyers demanded excess and unreasonable fees which Mr. Hill refused to pay.  As a result, the relationship between Mr. Hill and the BAM lawyers quickly soured.

58.     In July 2010, the BAM lawyers withdrew from representing Mr. Hill in the Hunt Trust Litigation, allowing BAM to file suit against Mr. Hill in October 2020 seeking more than $50,000,000 in attorneys' fees for just six months of legal work (the "BAM Litigation").

59.     By the end of 2010, when Blue had withdrawn from representing Mr. Hill and was embroiled in the BAM Litigation, she, in concert with her partners Charla Aldous and Stephen Malouf, decided at that point that an indictment against Mr. Hill would benefit the BAM lawyers in the fee dispute litigation, so she switched sides and joined forces with Hill Jr. to continue with him the intense pressure campaign on District Attorney Watkins to bring criminal charges against

the Plaintiffs.  Hill Jr. willingly and knowingly accepted her help, perhaps in part because Blue had improperly gained access to sealed material from Hill Jr.'s divorce file that was potentially damning to him.

60.    In reality, once Lisa Blue joined the effort, any doubt about whether Mr. and Mrs. Hill would be indicted evaporated.  Lisa Blue's control over District Attorney Watkins, honed over many years, was so complete that her word was sufficient to bring to fruition the effort that Hill Jr. had started and had been pushing for months.

61.    In January 2011, Mr. Hill and the BAM lawyers entered into a written agreement to start trial of the BAM Litigation in federal court on April 18, 2011.

62.    By January 12, 2011, the combined influence of Hill Jr. and Lisa Blue had reached the point where the District Attorney's office was willing to hold a "pitch session" as a prelude to taking the charges against Plaintiffs before a grand jury, even though no reasonable and disinterested prosecutor would have ever pursued these charges.  Craig Watkins and Terri Moore (an Assistant District Attorney) attended the pitch session at which they used a disturbingly unprofessional power point presentation – riddled with information that could have only come from Hill Jr., Mike Lynn, and David Pickett – to ridicule Mr. and Mrs. Hill, making clear that they were willing to be used as tools to further a campaign of terror against Mr. Hill.  With this power point (and the false information supplied by Hill Jr., Pickett, and Lynn) in hand, Watkins and Moore then approved taking the charges to a grand jury, but only after a staggering number of phone calls and text messages between Craig Watkins and Lisa Blue, some of which (by Blue's own admission) involved discussions between Blue and Watkins over whether Blue was still interested in the indictments.

63.    In March 2011, Blue exchanged numerous phone calls and text messages with Watkins and his assistant in the weeks leading up to April 2011 and the BAM Litigation.  The pattern of phone calls and text messages between Blue and Watkins revealed a dramatic spike in communications during the last two weeks of that month, culminating with Watkins's announcement of the indictments of Mr. and Mrs. Hill on April 1, 2011.

64.    Phone records show that Blue placed or received 37 calls to or from Watkin's office and cell phones, 14 of which occurred in March 2011 alone, immediately prior to Mr. and Mrs. Hill's indictments.  Blue's phone records also show 28 phone calls and text messages with Watkin's secretary, 19 of which were in March 2011.  The frequency of these calls and texts is different from any other period during the year prior and all but ceases with the return of the Plaintiffs' indictments.

65.    On March 3, 2011, Blue met with Watkins to take publicity photos in connection with a $100,000 donation Blue made in Watkins's honor to SMU law school in 2010.

66.    On March 9, 2011, Blue hosted a fund raiser for Watkins at her house where she personally contributed $5,000 to Watkin's campaign.

67.    On March 30, 2011, Blue traded seven calls with Watkins' cell phone number, and Blue and Watkins met for dinner.

68.    The next day, on March 31, 2011, a Dallas County grand jury returned multiple indictments against Mr. and Mrs. Hill for the offenses of making a false statement to obtain property or credit and securing execution of a document by deception.

**D. Plaintiffs Are Charged with Mortgage Fraud**

69.    On April 4, 2011, fourteen days before their scheduled trial of the BAM Litigation in federal court, Mr. and Mrs. Hill were notified by the Dallas County District Attorney's Office

that they had been indicted on multiple felony counts of mortgage fraud and that warrants had been

issued for their arrests. This was the first that they heard of any such investigation.

70.     The following indictments were issued against Mr. and Mrs. Hill:

F-1100180, for allegedly "intentionally and knowingly mak[ing] a materially false and misleading written statement to OmniAmerican Bank, namely: that [Mr. Hill] and Erin Nance Hill [his wife] were the only owners of real property located at 4433 Bordeaux Avenue, Highland Park, Dallas County, Texas, with the intent to obtain property, other than real property, namely, money of the United States of America and credit, namely a loan of money, the aggregate value of which was 200,000 or more."

F-1100182, for allegedly "intentionally and knowingly mak[ing] a materially false and misleading written statement to OmniAmerican Bank, namely: that [Mr. Hill's] gross monthly income from base employment income was $54341.00 with the intent to obtain property, other than real property, namely, money of the United States of America and credit, namely a loan of money, the aggregate value of which was $200,000 or more."

F-1100183, for allegedly "with intent to defraud and harm OmniAmerican Bank, caus[ing] OmniAmerican Bank to sign and execute a document, namely wiring instructions, which document affected the pecuniary interest of OmniAmerican Bank, the value of which pecuniary interest was $200,000.00 or more, and the defendant caused OmniAmerican Bank to sign and execute said documents by deception, namely by creating and confirming by words and conduct false impressions of facts that were likely to affect the judgment of OmniAmerican Bank in the transaction that the defendant did not believe to be true, by failing to correct false impressions of fact that were likely to affect the judgment of OmniAmerican Bank in the transactions that the defendant had previously created and confirmed by words and conduct that the defendant did not then believe to be true, and by transferring and encumbering real property, namely 4433 Bordeaux, Highland Park, Dallas County, Texas, without disclosing a security interest, an adverse claim, and other legal impediment to the enjoyment of the property, whether the security interest, adverse claim and impediment is or is not valid, and is or is not a matter of official record."

F-1100191, for allegedly "intentionally and knowingly mak[ing] a materially false and misleading written statement to OmniAmerican Bank, namely: that his Inwood National Bank account contained $102,174.00, with the intent to obtain property, other than real property, namely money of the United States of America and credit namely a loan of money, the aggregate value of which was $200,000 or more."

71.     These charges carried a maximum penalty of many decades in prison.  If convicted, Plaintiffs were facing the potential of spending the rest of their natural lives in prison and losing custody of their minor children.

72.     The charges were highly unusual for at least three reasons.  First, OmniAmerican Bank, the allegedly defrauded party, never complained about the loan in question and never itself pressed any charges against Plaintiffs.  Second, even if the facts alleged in the indictments had been true, OmniAmerican Bank was always over-secured on its loan, given that even 20% of the home's value exceeded the loan amount.  And, in any event, the loan was fully repaid well before the indictments were ever issued.  The Dallas District Attorney's office was ultimately forced to admit that these charges were unprecedented.

73.     The indictments, moreover, were based on false information and were factually inaccurate.  Mr. and Mrs. Hill did not act with the intent to defraud or harm OmniAmerican Bank.  Mr. and Mrs. Hill did not knowingly or intentionally make any materially false or misleading statements to OmniAmerican Bank.  OmniAmerican Bank was not defrauded or deceived.  The statements Mr. and Mrs. Hill made to OmniAmerican Bank were believed by to be materially accurate, were in fact materially accurate, and apprised OmniAmerican Bank of all material facts.

74.     In particular, with respect to income, OmniAmerican Bank obtained and reviewed Mr. Hill's income tax returns, itself made the determination as to how much income Mr. Hill should record on the loan application, and instructed Mr. Hill on how it wanted him to complete that portion of the loan application.  When OmniAmerican Bank gave that instruction to Mr. and Mrs. Hill, it already knew (because Mr. Hill had disclosed this fact) that Mr. Hill was in heated litigation with his father and needed the loan in part for liquidity purposes while he was litigating with his family.  Plaintiffs made no material misrepresentations to OmniAmerican Bank about

income, and OmniAmerican Bank was in no way misled on that topic. Having disclosed his liquidity and litigation issues to OmniAmerican Bank, Mr. and Mrs. Hill certainly had no intent to deceive OmniAmerican Bank or any knowledge that OmniAmerican Bank was laboring under any false impression of material facts.

75.    The same is true with respect to representations about balances in Mr. Hill's Inwood bank accounts. Mr. Hill supplied OmniAmerican Bank with proof of the balance information in his accounts, and OmniAmerican Bank used that information to fill in the section of the loan application that dealt with account balances. OmniAmerican Bank then made its own decision that independently verifying bank balances and bringing balance information current to the closing date was not material. Plaintiffs were never asked to update the balance information. They made no misrepresentations to OmniAmerican Bank about account balances, and OmniAmerican Bank was in no way misled on that topic.

76.    Mr. and Mrs. Hill, moreover, made no misrepresentations about ownership of the Plaintiffs' Residence at 4433 Bordeaux Avenue. When Mr. Hill applied for the loan, he and Mrs. Hill owned 100% of the property in fee simple, as evidenced by a deed that was filed of public record. OmniAmerican Bank independently verified this fact – and satisfied itself that it was accurate – by having a title search performed and obtaining a policy of title insurance. OmniAmerican Bank also became aware, before issuing the loan, of a potential claim (that later became the crux of the indictments against Plaintiffs) to an 80% interest in the property and apparently satisfied itself that this alleged interest was no impediment to issuing the loan. OmniAmerican Bank knew of this alleged interest through two sources. First, Plaintiffs disclosed it to OmniAmerican Bank during the process of applying for the loan. Second, a document purporting to give notice of this alleged interest was filed in the official real property records of

Dallas County, Texas, and was picked up in the title search commissioned by OmniAmerican Bank. OmniAmerican Bank must have itself determined that this alleged interest did not materially diminish the 100% ownership in the property held by Plaintiffs and confirmed that Mr. and Mrs. Hill's representations of ownership in the loan documents were accurate.

77.     It is thus not at all surprising that, even after being informed of the facts alleged in the indictments and of the issuance of the indictments, OmniAmerican Bank and its mortgage broker never accused Plaintiffs of any fraud or deception. In fact, the mortgage broker's reaction to the indictments was clear and simple: "There was nothing fraudulent as we verified tax returns[,] credit and title." As the broker recognized, Plaintiffs were completely innocent of the charges set forth in the indictments.

78.     Notwithstanding these facts, Craig Watkins, after being influenced improperly by Hill Jr., Blue, and others, filed these criminal charges against Plaintiffs. Hill Jr. and Blue, along with the help of others, initiated and procured these charges by supplying false information to District Attorney Watkins and his staff; exerting undue pressure and influence over District Attorney Watkins and his staff; supplying District Attorney Watkins with improper financial incentives to indict Plaintiffs; and convincing District Attorney Watkins to indict Plaintiffs in exchange for personal and political favors and cash donations.

79.     All of this was perpetrated out of spite and malice and for no legitimate purpose. The prosecution of the Plaintiffs was pursued to punish Mr. and Mrs. Hill, deprive them of their children, and to gain financial advantage over them. None of the parties involved in this process had probable cause to believe that Mr. and Mrs. Hill committed a crime because, as detailed herein, they all knew that the lynchpin of the charges – Plaintiffs' alleged ownership of only 20% of the

Plaintiffs' Residence – was false and knew that OmniAmerican Bank had not been misled or defrauded.

80.     As the foregoing makes clear, at least the following defendants "initiated" the criminal prosecution of Mr. and Mrs. Hill: Hill Jr. (by himself directly pressing charges against Mr. Hill and by directing others to do so on his behalf); Michael Lynn and Michael Gibson (by directly pressing charges against Mr. Hill); David Pickett (by directly pressing charges against Mr. Hill); Lisa Blue (by directly pressing charges against Mr. Hill); Craig Watkins (by making the decision to present the case to the grand jury and by filing the charges against Mr. Hill); and Terri Moore (by making the decision to present the case to the grand jury and by filing the charges against Mr. Hill).

81.     It is also clear from the foregoing that at least the following "procured" the criminal charges against Mr. Hill: Hill Jr. (by presenting false information to the DA and exerting undue pressure and improper influence on the DA); Michael Lynn and Michael Gibson (by presenting false information to the DA and exerting undue pressure and improper influence on the DA); David Pickett (by presenting false information to the DA and exerting undue pressure and improper influence on the DA); Lisa Blue (by exerting undue pressure and improper influence on the DA); Craig Watkins (by succumbing to undue influence and improper pressure, financial and otherwise); Terri Moore (by succumbing to undue influence and improper pressure, financial and otherwise); and Jeff Tillotson (by exerting undue influence and improper pressure on Craig Watkins).

82.     Each of these parties was motivated by malice, as detailed above.  And, none of these parties had probable cause to believe that Mr. Hill committed the crimes with which he was charged.  Each of these parties knew that Mr. Hill and his wife in fact owned 100% of the home

on Bordeaux Avenue and that the alleged transaction to convey an 80% interest to a trust did not render inaccurate any representation made by Mr. Hill in the loan application or otherwise. Each also knew that OmniAmerican Bank had not been defrauded about ownership of the home or about any aspect of Mr. Hill's financial condition. And, none of them contacted Mr. Hill, the mortgage broker, or the bank to inquire whether Mr. Hill intended to mislead or intentionally or knowingly made misrepresentations of material fact or whether the broker and the bank were in fact misled on material facts. Given the mens rea requirements for the charges they were asserting against Mr. and Mrs. Hill, no reasonable determination of probable cause could have been possible without such inquiries, which were not made.

**E. The Impact of the Indictments on the BAM Litigation and Other Civil Litigation**

83.     Due to suddenness of these unexpected indictments on the eve of the scheduled BAM Litigation trial, Mr. and Mrs. Hill asked for a continuance of the trial against BAM but were given only two days.

84.     Trial began on April 20, 2011, and Mr. and Mrs. Hill, in light of the indictments, could not safely testify. They remained silent and the magistrate judge made findings against them and in favor of the BAM lawyers.

85.     In a deposition Blue gave on June 14, 2011, she admitted that prior to the indictments she went to talk to the First Assistant District Attorney, Terri Moore, about the indictment because Mr. Hill was "not just [her] client, he was a close friend." Blue went on to admit that when Watkins called her "shortly before the indictments came down" and "said something about the – there was – there could be an indictment or are you still interested in the indictments" that she responded to Watkins by saying that she didn't "represent the Hills anymore

and so it would be inappropriate for [her] to talk about it."  Blue testified that these were the only two phone conversations she recalled having with Watkins during that time.

86.     On December 31, 2011, Judge O'Connor found that Mr. Hill had breached his attorney fee agreement with the BAM lawyers and awarded BAM $21.9M, of which Blue, Aldous, and Malouf all received an equal $7.3 million share.

87.     In the summer of 2012, Mr. Hill was forced into an arbitration of other disputes with other lawyers who were claiming tens of millions of dollars.  As had happened in the April 20, 2011 trial against the BAM lawyers, Mr. Hill was again prejudiced by the pending indictments and forced to assert his Fifth Amendment from testifying.  Ultimately, the criminal indictments ended up costing Plaintiffs in excess of tens of millions of dollars.

**F. Defendants Continue to Terrorize Plaintiffs throughout the Criminal Proceeding.**

88.     On February 21, 2013, the Highland Park Police Department responded to a residential burglary alarm and discovered four investigators and Defendant Strittmatter from the Dallas County District Attorney's Office had broken into the home of Mr. and Mrs. Hill at 4433 Bordeaux Avenue.

89.     The local police did not intervene because the investigators said they entered the home pursuant to a search warrant, but in reality the investigators had no search warrant.  Instead, the investigators entered the home at the personal direction of Defendant Watkins, unlawfully.

90.     Defendant Blue, for her part, continued to press for conviction all the way up to final dismissal of the charges.  For example, on January 14, 2014, Blue filed an Amicus Brief in the Court of Appeals—as well as a Motion seeking permission to personally present oral arguments against Mr. Hill to the Court—in an effort to ensure his conviction.  The DA's office,

for its part, consented to Blue's attempt to testify against her former client in the criminal proceeding.  Ultimately, the Court denied Blue's filings.

### G. Plaintiffs' Exoneration and Dismissal of the Charges

91.    On October 12, 2012, Assistant District Attorney Deborah Smith, in a meeting with the Hill's lawyer after she took over prosecuting the Hill's criminal cases, "expressed significant concerns about the cases" and "stated that she would refuse to try the case if the District Attorney's Office decided to go forward on any of the charges" and "apologized."

92.    In October 2012, shortly after the meeting with Mr. Hill's lawyer, the District Attorney's office moved to dismiss all charges against Mrs. Hill "in the interest of justice."

93.    On October 22, 2012, Deborah Smith was taken off Mr. Hill's case and reassigned to prosecute animal cruelty cases.  Shortly thereafter she was fired.

94.    On November 16, 2012, Mr. Hill filed a motion to quash and dismiss the indictments due to prosecutorial misconduct.

95.    Mr. Hill claimed that Watkins and his office, including assistants Terri Moore, Donna Strittmatter, and Stephanie Martin, were acting under the influence of Hill Jr., and in concert and agreement with Hill Jr., who had a motive to retaliate against Mr. Hill based on the development of the Hunt Trust Litigation and to influence its outcome, and to punish him for asserting his rights in that case.

96.    Mr. Hill also claimed that Watkins and his office, including assistants Moore, Strittmatter, and Martin, were acting under the influence of Blue, Aldous, and Malouf, and in concert and agreement with Blue, Aldous, and Malouf, who had a pending lawsuit against Mr. Hill in which they were claiming more than $50,000,000.

97.     Mr. Hill claimed that Watkins and his office, including assistants Moore, Strittmatter, and Martin, violated Mr. and Mrs. Hill's rights to equal protection by selectively prosecuting them for conduct that does not normally lead to criminal prosecution.

98.     On February 14, 2013, a hearing was held before Dallas County District Judge Lena Levario to which Mr. Hill had subpoenaed Watkins, Moore, Strittmatter, Martin, and Blue.

99.     Judge Levario expressed concern about "what, if anything, caused [the District Attorney] to present evidence to a Grand Jury at that particular point in time, that is coincidental, with civil lawyers in a couple of weeks ahead of time making huge contributions to the District Attorney, and [] admissions by Ms. Blue that she discussed the indictments with Mr. Watkins."

100.    When Blue took the witness stand she invoked her Fifth Amendment right against self-incrimination on all questions.  The State objected to Watkins being questioned "on the basis of lawyer/client privilege, arguing that the conversations between Blue and Watkins were work product because they would 'reveal [Watkins'] mental impression."  When Judge Levario overruled the State's objections, an assistant in his office informed the Court that "she had spoken to Watkins, that he was not going to make himself available, and that he was 'ill' and not 'in a condition to be able to testify in this matter.'"  Judge Levario granted the State a continuance.

101.    At the continuation of the hearing on March 7, 2013 when Mr. Hill called Watkins as a witness, Watkins refused to answer any questions "because of [his] right as an attorney to have the privilege and to protect [his] work product."  When Judge Levario overruled the objections and ordered Watkins to answer the questions he refused and was held in contempt.

102.    Moore testified that Strittmatter and Martin came to her about the complaint they had been given by Lynn on behalf of Hill Jr. and asked to use the resources of the District Attorney's office to investigate the complaint.  Moore testified that she warned Strittmatter and

Martin that "dad [Hill Jr.] is trying to get some kind of strategic advantage over his son in the [Trust Litigation]" and they should "[b]e careful, because he's just using the office." Moore also testified that Blue came to her with a federal court opinion demonstrating Hill Jr.'s "credibility problems" while "trying to help [Mr. Hill]."

103. Strittmatter testified that she and Martin invited Watkins to a "pitch session" on Mr. and Mrs. Hill potential indictments, after which she believed she had Watkins's approval for presenting the indictments to the Grand Jury.

104. Martin testified that she received a second complaint about the Bordeaux mortgage from David Pickett, who was trustee for the Margaret Hunt Trust, pushing the indictments, saying the trust as the 80% owner of the property was the true complainant.

105. On questioning first from Judge Levario, and later by counsel for Mr. Hill, Martin testified inconsistently. Initially Martin said that she had decided to present the matter to the Grand Jury based upon her belief that she "had a good case," that no other person was responsible for the investigation, that no one had decided that issue for her, she did not "give this case any special consideration", and "no one tried to interfere with [her] investigation . . . Other than Mr. Pickett, obviously, pushing you, pushing you to get an indictment . . . ."

106. Then on cross-examination of Martin by Mr. Hill's counsel with Martin's handwritten notes, the story changed. Martin admitted that "Pickett was calling her 'all the time' about the case and that she had told him that the 'investigation [was] going slowly.' Her note also mentioned that she told Pickett that "in research [she'd] done, [she] didn't see how [she] could prove his criminal case." Martin also noted that the bank was not interested in prosecuting the case because the loan was repaid.

107.    Martin testified that when she told this to Pickett he told her she should consult with Moore about her decision, and that Moore told her "to continue with the investigation." Judge Levario then clarified with Martin: "You've got David Pickett saying you need to file this case. You're telling him, I don't think I have a case. You bump it up to Terri Moore, and Terri Moore tells you, investigate it." To which Martin told Judge Levario that she would have been surprised if Watkins had told her not to indict Mr. and Mrs. Hill.

108.    Judge Levario concluded that Watkins was "calling the shots" and that she needed to hear from him and Blue but was faced with the fact that neither was willing to testify. Judge Levario concluded that "Watkins and Blue were the only two persons who would know whether Watkins' decision to pursue these charges against Hill [Mr. Hill] could have been influenced by Blue and [Hill Jr.], but neither Watkins nor Blue were testifying."

109.    Judge Levario ruled that "because of the failure of Mr. Watkins to testify in this hearing, the Defendant has been denied his right to have a meaningful hearing on his Motion to Dismiss. And on that basis, I'm dismissing the cases."

110.    The State appealed to the Fifth Court of Appeals.

111.    Following Judge Levario's ruling, Blue and Watkins funded and supported an opponent, one of Watkin's assistants, to unseat Judge Levario. They succeeded. Judge Levario is no longer a District Judge because she ruled against the interests and exposed the corruption of Blue, Watkins, and Hill Jr.

112.    On December 29, 2014, the Fifth Court of Appeals reversed Judge Levario determining that she had "erred in conducting an evidentiary hearing." Appeals Court Judge Bridges, dissented saying "No appellate court in Texas has ever ruled that a trial court erred in

conducting a hearing on a defendant's motion to dismiss charges on the basis they violated his

constitutional rights."

113.    In his dissent, from his review of the record, Judge Bridges, went on to write:

Hill's motion to quash and dismiss the indictments was based on the following facts: Hill and his father were involved in "a hotly-contested federal lawsuit involving multi-billion dollar trusts." In February 2010, the federal judge presiding over the case entered an order finding that Hill's father had testified falsely and submitted evidence in bad faith. Four days later, Hill's father, through his lawyer, submitted to the Dallas County District Attorney's Office a letter accusing Hill and his wife of mortgage fraud. In the months that followed, a law partner donated a total of $48,500 in three contributions to the re-election campaign of Dallas District Attorney Craig Watkins. No member of this firm had previously donated to Watkins's campaign.

In May 2010, Lisa Blue saw a magazine article raising the question of whether the district attorney's office would "go after" Hill "for shenanigans related to the house in which they live." The article described the circumstances surrounding the same $500,000 loan that had been reported to the district attorney. After Blue learned the investigation of Hill's alleged criminal conduct had been leaked to the press, she had a meeting with Terri Moore, First Assistant District Attorney at the time. Blue recommended that Hill not be indicted. Watkins was not present at the meeting.

Also in May 2010, the federal trust litigation settled. Following the settlement, Blue and her colleagues had a conflict with Hill over payment of more than $50 million in attorneys' fees attributed to Blue's six-month representation of Hill. Because of the indictments, Hill felt he could not testify and invoked his Fifth Amendment rights in the federal proceeding.

On January 20, 2011, Blue and Watkins met for dinner. Also in January 2011, while Blue was with Steve Malouf, Watkins called Blue and said, "There could be an indictment or are you still interested in the indictments or . . . ." On another occasion, the date of which Blue could not remember, Watkins called Blue and again "mentioned the Hills." Blue said, "Craig, remember, I don't represent the Hills, so I can't—there's nothing that I could talk about." Another lawyer was with Blue when she received this second call.

Blue and Watkins exchanged numerous phone calls in March 2011. On March 3, 2011, Blue met with Watkins to take publicity photos in connection with a $100,000 donation Blue made in his honor to SMU law school in 2010. On March 9, 2011, Blue had a fundraiser for Watkins at her house and contributed $5000 to Watkins. On March 22, 2011, Blue was deposed in connection with her fee dispute with Hill. On March 30, 2011, Blue and Watkins again met for dinner. On March 31, 2011,

the Hills were indicted on charges of mortgage fraud.  The indictments were made public two weeks before the $50 million fee dispute trial.

On October 12, 2012, approximately eighteen months after the Hills were indicted, the Hills' defense counsel met with Assistant District Attorney Deborah Smith who described a "reevaluation" of certain cases and said she had already decided to recommend dismissing certain charges against both Hill and his wife.  Smith "expressed significant concerns about the cases against the Hills, made clear that she had no role in obtaining the indictments, [and] said that the interviews of witnesses she was conducting should have been conducted much earlier."  Shortly after the meeting, the DA moved to dismiss all charges against Hill's wife "in the interest of justice."  On October 22, 2012, in response to a follow-up email from Hill's counsel, Smith wrote that she had been reassigned to prosecute animal cruelty cases.

On February 14, 2013, the trial judge conducted a hearing on Hill's motion to dismiss.  The trial judge stated she did not take her authority to dismiss a case filed by the prosecutor lightly and emphasized the limited nature of that authority.  The trial judge, over the State's objection, called Blue as a witness.  Blue took the stand and invoked her Fifth Amendment right on all questions.

Hill's attorney called Watkins to the stand.  Counsel for the State objected on the basis of lawyer/client privilege.  Specifically, counsel argued the State of Texas was represented by the district attorney, and the State therefore had a right to assert the privilege to prevent its lawyers from disclosing "any other fact which came to their knowledge by virtue of their representation of the State."  Counsel for the State argued conversations between Blue and Watkins were work product because they would "reveal [Watkins's] mental impression."  The trial judge instructed the State to "bring Mr. Watkins down."

An assistant district attorney entered the courtroom and stated she had spoken to Watkins, Watkins was in the office, but Watkins was not going to make himself available.  The trial judge asked if Watkins was informed that the questions were going to be limited to his discussions with Blue.  The assistant district attorney stated she was not aware of that and further stated she knew "[Watkins] to be ill," and he was not "in a condition to be able to testify in this matter."  Following further discussion as to the extent of Watkins's illness and the fact that Watkins was under subpoena to testify, the trial judge granted a continuance.

On March 7, 2013, the trial judge conducted a hearing at which Blue's counsel stated Blue's position that "she would assert her Fifth Amendment privilege today just as she had before."  Hill called Watkins as a witness and, after a private consultation with counsel, Watkins took the stand and refused to answer any questions "because of [his] right as an attorney to have the privilege and to protect [his] work product."  Following a discussion of whether any privilege had been waived by providing affidavits of the people who worked for Watkins, the trial

judge ordered Watkins to answer the questions. Watkins refused, and the trial judge held him in contempt.

Hill was prepared to call witnesses to testify regarding the authenticity of the exhibits attached to his motion to dismiss and certain other documents. Although it is not clear which exhibits were at issue, counsel for the State agreed he was stipulating to the authenticity of the exhibits.

Terri Moore, a former Dallas assistant district attorney, testified Donna Strittmatter and Stephanie Martin, two other assistant district attorneys, came to Moore and asked for permission to use the resources of the office to investigate Hill. Moore inquired whether Hill's father had made the allegations against him, and Strittmatter and Martin told Moore "there was a lawsuit between the father and the son." Moore said, "I'm sure dad is trying to get some kind of strategic advantage over his son in the lawsuit, so be very, very skeptical of whatever he may have told you." Moore added, "Be careful, because [Hill's father] is just using the office . . . ."

Strittmatter testified she attended the pitch session at which Watkins was present. Watkins did not say anything about conversations with Blue regarding the Hills. Strittmatter testified Watkins's only involvement in preparing the case for the grand jury was that he was present at the pitch session. The pitch session was in January 2011, and the case was presented to the grand jury approximately two and a half months later.

Strittmatter testified Moore told her "to be suspicious of the complaint" she received from Hill's father. Strittmatter later learned the trust "offered the bargain over a nonprosecution affidavit in this case" so that Hill would drop his claim for the assets of the trust. In investigating the case, Strittmatter discovered the "title agency missed something on the abstract of the property." When asked if she was aware whether the Dallas County District Attorney's Office had "indicted a mortgage fraud case where the loan was fully collateralized, paid as expected, and repaid in full and there was no complaint from the bank, but it was indicted anyway," Strittmatter answered she "was not aware because [she had] not been the mortgage fraud prosecutor." When asked the same question again, Strittmatter answered, "I don't know, but that doesn't mean it hasn't happened." When the trial judge asked if there was a way to identify similar cases via computer, Strittmatter answered, "We have a computer, but it wouldn't say that much detail, Your Honor. It'd really be the—the prosecutors' individual memory."

Martin testified that, on February 22, 2010, Strittmatter called her into a meeting with Lynn and gave her a copy of a complaint alleging Hill had stolen from the trust "because eighty percent of the house was put into a mortgage." Martin denied having "concerns about a case in which the bank was not the one that complained about the alleged fraud." Martin testified Moore told her to be suspicious of Hill's father. Martin testified that, from the moment she got the complaint and reviewed

the exhibits, she thought she had a good case and immediately started requesting original documents.

Martin invited Watkins to the pitch session because the case against Hill "would get some media attention, possibly national media attention." Martin testified that, if Watkins had told her "this is too much of a hot potato; let's just let it go," she would not have put the case before the grand jury.

On redirect examination, Hill's counsel showed Martin notes Martin identified as "two different days where I wrote notes about having talked to David Pickett." The first date was September 8, 2010, and noted the following:

David Pickett calls all the time. Investigation is slowly going, and I told him that. Today he wanted a definite timeline. I told him I can't give you a timeline. I've got things to do on the case and haven't done them because I'm getting ready for trial. He said Trust is actual victim after I told him bank really isn't interested in prosecuting. Told him that in research I'd done, didn't see how I could prove his criminal case at this time. He said he sent—gave all that stuff to me. I said I'd go back and look, but getting ready for trial. He then sends e-mail. I showed it to Chief D. Strittmatter, and then she said to show to First Assistant Terri Moore so she would have all info, if needed. Took to Terri Moore, and she said, okay, in a few weeks call him to discuss the matter.

Upon further questioning, Martin testified the bank's general counsel said "we wouldn't have filed a complaint because we—the loan got repaid, but she would do whatever [Martin] wanted her to do as far as prosecuting the case because, by law, she has to." The trial judge, reading from Martin's notes, stated "and then it goes on to say, I've talked to David Pickett multiple times since then. He was okay with not indicting for the Trust as a victim because the bank is actual—who was defrauded under the fraud statutes and going forward with indictments." In response to questioning, Martin testified the part of her note the trial judge read was "probably" added after Hill filed his motion to dismiss for prosecutorial misconduct.

Thus, as the trial judge summarized the situation, the pitch session was held only because the case against Hill was a potentially high publicity case; Martin invited Watkins to the pitch session and would not have gone forward with the case against Hill without Watkins's approval; the only person who could know Watkins's motivations was Watkins and, maybe, Blue; and neither Watkins nor Blue were testifying. The trial judge gave Watkins another opportunity to come down and testify and took a brief recess. When the hearing recommenced, counsel for the State told the trial judge Watkins would not testify.

Following the presentation of evidence, the trial judge made an oral finding that, "because of the failure of Mr. Watkins to testify in this hearing, the Defendant has

been denied his right to have a meaningful hearing on his Motion to Dismiss." The trial judge then dismissed the cases.

114.    The Court of Criminal Appeals of Texas granted Mr. Hill's request for discretionary review of the Fifth Court of Appeals decision reversing dismissal of the indictments, and reversed, reinstating Judge Levario's decision.  The mandate later issued from the Fifth Court of Appeals is dated October 26, 2018 and was filed on October 29, 2018.

115.    The Concurring Opinion written by Court of Appeals Judge Schenck reads, in part, as follows:

> The record reflects that these cases began with a financial grievance between a father and son.  It was Hill's father, not any victim or complainant, who submitted to the district attorney's office a letter accusing Hill and his wife of mortgage fraud.  Further, there was evidence a law partner of Hill's father's counsel donated a total of $48,500 to Watkins's campaign.  After Hill and his father settled their dispute, Hill became embroiled in a dispute with his former legal counsel, Lisa Blue, over more than $50 million in attorney's fees attributed to her representation of him.  In the months leading up to Hill's indictments, Watkins called Blue to discuss "the Hills" and asked if she was "still interested in the indictments," and Blue held a fundraiser for Watkins and made sizeable, lawful contributions to him as her fee dispute with Hill proceeded to trial.  In his motion to quash or dismiss the indictments, Hill presented evidence, presumably credited by the trial judge sitting as finder of fact,' indicating that Watkins pursued the indictments in retaliation for the civil litigations involving Hill's father and Blue, that a public servant made himself available to influence, and that the charges against him would not have been pursued other than as a political favor by the district attorney.  When called to testify at the hearing on Hill's motion to dismiss, Blue invoked her Fifth Amendment right on all questions.  Watkins first failed to appear and ultimately refused to answer any questions, invoking specious attorney client privilege and work-product immunity objections.

> **Due Process**

> Texas elects its district attorneys on a partisan basis and leaves them to finance their campaigns from members of the general public, a tiny percentage of whom decide, for their own reasons, to contribute.  Barring the explicit quid pro quo to constitute a "bilateral agreement" at the time the money changes hands, there is generally no offense in a citizen lawfully contributing to an official's political campaign or otherwise engendering good will.  *See, e.g., McCallum v. State,* 686 S.W.2d 132, 139 (Tex. Crim. App. 1985).  The problem, of course, as this case illustrates, is that the public official is obliged, thereafter, to discharge his duties impartially and in a manner consistent with due process and other rights of the

parties affected by his or her decisions. The trial court was presented with evidence supporting the inference that the charging decision in these cases was rendered as a perceived favor to influential political contributors and would not otherwise have been pursued. *See Lerma,* 543 S.W.3d at 190 (reviewing court should construe inferences reasonably supported by the evidence in favor of the resulting judgment where no proper findings of fact obtain); *cf State v. Terrazas,* 962 S.W.2d 38, 45 (Tex. Crim. App. l 998) (Keller, J. dissenting) (urging that."[p]rosecutorial misconduct rises to the level of a due process violation . . . if it significantly compromises the fundamental fairness of the proceedings" and where compensation scheme influences decision to prosecute)

The Supreme Court has struggled to delineate the outer limits of the improper influence concern insofar as it applies to elected judges, settling on an objective standard that avoids the question of whether the judge was actually biased in rendering a decision in favor of a contributor, posing the question as whether an objectively reasonable jurist under similar circumstances would be likely to be improperly influenced. *Caperton v. Massey Coal, 556* U.S. 869, 886 (2009). While the prospect of a compromised judge is worrying enough, a trial judge's discretionary judgments are subject to review and correction on appeal, and appellate panels are themselves comprised of multiple members, offering greater assurance of independent review. A prosecutor, on the other hand, stands alone with largely unfettered charging discretion that, but for the highly unusual circumstances of cases like this one, is necessarily beyond any generalized form of meaningful judicial scrutiny. *See, e.g., McCleskey v. Kemp,* 481 U.S. 279, 296, 311-312 (l 987).

The record supports a conclusion that an objectively reasonable prosecutor under circumstances similar to those presented here would likely be improperly influenced. While political contributions within statutory limits are both lawful and regular, the concern here is not with Hill's father's counsel and Blue's decisions to support Watkins's campaign or promote his career, which they had every right to do. Rather, the concern is with the prosecutor himself and his apparent eagerness to curry Blue's favor, even going so far as to explicitly suggest "[t]here could be an indictment or are you still interested;" while knowing of the ongoing $50 million fee dispute between Blue and Hill. Further, Watkins was alerted to the alleged mortgage fraud by Hill's father, rather than a crime victim, and the record contains the testimony of career prosecutors, whom the record does not reflect solicited or otherwise received improper influence, as to the tenuous nature of the case against Hill. From these facts, I agree with the majority that the trial judge could have readily based her decision on the grounds of vindictive prosecution and conflict of interest, given the competing interests of which Watkins appears to have been solicitous. But I believe that the due process violation as recognized in *Massey Coal* could serve as an independent and direct ground for dismissal. *See Massey Coal,* 556 U.S. at 886. A reasonable prosecutor, knowing of the facts known to Watkins prior to the time he approached the grand jury seeking the indictments, would have recognized he harbored a disposition of a kind that a fair-minded person could not set aside. *See id.* at 889.

***

In the instant case, the trial judge had ample evidence on which to base her decision to dismiss with prejudice on either a finding of egregious misconduct by the district attorney or a finding that but for his misconduct no case would have been brought.

*First,* Watkins solicited and retained significant financial benefits from those with a financial interest in any potential criminal proceedings against Hill, which are reminiscent of the contributions in *Massey Coal* that, even without proof of actual bias, "had a significant and disproportionate influence in placing" a judge on a particular case, requiring the judge's recusal.  *See Massey Coal,* 556 U.S. at 884-86.  While I do not mean to suggest that the receipt or solicitation of lawful campaign contributions, without more, would require recusal generally or dismissal of the indictments in this case, the financial interests involved here are hardly alone. *Cf Terrazas,* 962 S.W.2d at 45.

*Second*, Watkins had an extraordinary 37 calls with Blue around the time of the indictments, including at least one call in which he openly inquired whether she was still interested in the indictments despite his awareness of her $50 million fee dispute with Hill.  They also met for dinner on numerous occasions, including the evening before the indictments were returned.

*Third*, the record contains the unfortunate and inconsistent testimony of career prosecutors as to the validity of the case against Hill and the evidence in this case.  At the hearing on Hill's motion to dismiss, assistant district attorney Stephanie Martin initially testified that from the moment she got the complaint, in her mind, she had a good case and was "always presenting it to the Grand Jury." She was subsequently impeached with handwritten notes she made about her conversations with the Hill trust's attorney David Pickett.  Her notes reflect that she told Pickett that after doing research, she did not see how she could prove his criminal case at that time.  The judge asked Martin, "The bank is not interested in prosecuting, and your client is not a victim; that's what you told Mr. Pickett?" Martin responded, "Yes."  In addition, Martin later went hack and added to her notes the following: that she had talked to Pickett multiple times since her original note and that he was okay with not indicting "for the trust as a victim" and going forward with indictments listing the bank as the victim.  Martin acknowledged she "probably" added that note sometime after Hill filed his motion to dismiss,

*Fourth*, the timing of the letter from Hill's father accusing Hill of mortgage fraud and the heated exchange of calls between Watkins and Blue would support an inference that forces outside the district attorney's office were at work.

*Fifth*, the record shows a farcical game of hide and seek played by Watkins when he was called to testify, resulting in the trial judge's ultimately being forced to hold him in contempt.  Based on the foregoing record, the trial judge could have inferred that Watkins was seeking to please patties interested in the proceeding

under circumstances that implicate an improper motivation.  *See Massey Coal*, 556 U.S. at 886.

From the evidence of Watkins's courting the outside influence over the investigatory and charging decisions from parties known to be financially adverse to Hill, all without any complaint from or showing of harm to the lender, the trial judge could have readily found that Watkins denied Hill the right to an impartial and disinterested prosecutor in violation of his due process rights.  The trial Judge could have inferred that, but for the relationship Watkins nurtured with Blue, no prosecution would have been pursued.  Also, and separately, the trial judge here could have readily concluded that simply returning the State and the defendant to the natural *status quo ante* would have resulted in no prosecution at all.  This was not a case in which a crime victim or the police brought forward a charge that was thereafter mishandled by an overly aggressive or inept prosecutor.  But for the misconduct here, there would likely have been no prosecution to pursue.

116.    In 2019, Mr. Hill filed two actions in Harris County, Texas, against Blue, Malouf, Lynn, Tillotson, Watkins, Moor, Wilson, Hunt family members, and others in which he made Texas State common law claims for conspiracy and malicious prosecution.  After those claims were initially removed to Federal Court in Dallas, they were remanded by Judge Lindsay, who also denied certain defendants' Motion to Enjoin Vexatious Litigation.

117.    On remand, the Defendants in the Harris County cases moved to dismiss the cases as violating the Texas SLAPP statute.  The District Court granted the Defendants' motion and all claims in the Harris County cases are on appeal before the First Court of Appeals in Houston.

## DAMAGES

118.    The Plaintiffs were investigated, charged, and prosecuted for a crime which they did not commit merely because Dallas County District Attorney Watkins, and his office, freely disseminated executive power in return for political favors.

119.    As a direct result of Defendants' intentional wrongful acts and omissions, Plaintiffs sustained injuries and damages, which continue to date and will continue into the future, including: harm to Plaintiffs' good name, reputation, honor, and integrity; damage to Plaintiffs' standing and associations in their community; imposition of stigma; physical pain and injury; severe mental

anguish and emotional distress; loss of family relationships; loss of property; humiliation, indignities, and embarrassment; more than tens of millions in legal expenses; and disabilities in the Hunt Trust and BAM Litigations resulting in adverse rulings, for which Plaintiffs are entitled to monetary relief.

120.    Additionally, the emotional pain and suffering caused by the Defendants' misconduct has been substantial.    Through the course of Defendants' investigation and prosecution, Plaintiffs were publicly humiliated and ultimately had to move out of Dallas County to flee from Defendants' unconstitutional misconduct and to enjoy a normal life.    Plaintiffs (and their children) endured mistreatment as a result of Defendants' actions, including severe emotional distress, anxiety, deprivation of friendships and familial relations, and loss of a normal life.

## CLAIMS FOR RELIEF

## FEDERAL CAUSES OF ACTION

### Count I – 42 U.S.C. § 1983
### Engaging in Abuse of Executive Power and Violations of Due Process that Shock the Conscience in Violation of the Fourteenth Amendment

*Against All Defendants*

121.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

122.    The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law."

123.    The Supreme Court has recognized that "executive abuse of power . . . which shocks the conscience" amounts to a due process violation.  *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868 (2009)

124.     As described above, Defendants—acting individually and in concert—deliberately engaged in arbitrary and conscience-shocking conduct that contravened fundamental canons of decency and fairness, violated Plaintiffs' due process rights under the Fourteenth Amendment, and deprived them of property and liberty.

125.     Defendants—acting individually and in concert—violated Plaintiffs' due process rights in connection with not only the criminal lawsuit but in ongoing civil proceedings, including the BAM Litigation.

126.     The effort to co-opt the DA to help in a civil case started with Hill Jr. in 2010. At that time Lisa Blue was Mr. Hill's lawyer and told him not to worry, that in addition to the fact that he was not guilty of anything, she had serious leverage with the DA, cultivated over years of contributions and political support, that she could bring to bear to prevent such an indictment. But, once a fee dispute developed, Blue withdrew from representing Mr. Hill and switched sides to use the same threat as leverage to get her fees. Once the flurry of calls and meetings with Blue began the indictment came promptly.

127.     As a direct and proximate result of Defendants' actions herein, Plaintiffs sustained, and continue to sustain, the injuries and damages set forth above.

### Count II – 42 U.S.C. § 1983
### Irrational and Wholly Arbitrary Treatment in Violation of the
### Equal Protection Clause of the Fourteenth Amendment

*Against All Defendants*

128.     Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

129.     The Fourteenth Amendment provides that "[n]o state shall . . . deny to any person within its jurisdiction the equal protection of the laws."

130.    As described above, Defendants—acting individually and in concert—deprived Plaintiffs of their rights to equal protection by intentionally subjecting them to differing and unique treatment compared to others similarly situated.

131.    As described above, the evidence establishes that the indictment and continued prosecution of Plaintiffs was discriminatory, vindictive, malicious, and proceeded without any rational basis.

132.    As a direct and proximate result of Defendants' actions herein, Plaintiffs sustained, and continue to sustain, the injuries and damages set forth above.

### Count III - 42 U.S.C. § 1983
### Procurement of a Warrant Without Probable Cause
### In Violation of the Fourth and Fourteenth Amendments

*Against All Defendants*

133.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

134.    The Fourth Amendment, as incorporated into the Fourteenth Amendment, provides that "no Warrants shall issue, but upon probable cause . . . ."

135.    As described above, Defendants—acting individually and in concert—with malice and knowing that probable cause did not exist to prosecute Plaintiffs for the alleged mortgage fraud charges, nonetheless intentionally indicted Plaintiffs and procured a warrant for Plaintiffs' arrest, in violation of Plaintiffs' Fourth Amendment Rights.

136.    As a direct and proximate result of Defendants' actions herein, Plaintiffs sustained, and continue to sustain, the injuries and damages set forth above.

### Count IV – 42 U.S.C. § 1983
### Unreasonable Search in Violation of Fourth and Fourteenth Amendments

*Against All Defendants*

137.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

138.    The Fourth Amendment, as incorporated into the Fourteenth Amendment, provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

139.    As described above, Defendants—acting individually and in concert—wrongfully indicted Plaintiffs and conducted a prolonged criminal investigation into Plaintiffs' personal and business affairs with retaliatory motive and for the purpose of harming Plaintiffs in unrelated civil disputes.  This misconduct amounts to an unreasonable search under the Fourth Amendment.

140.    In addition, Defendants—acting individually and in concert—broke into the home of Mr. and Mrs. Hill at 4433 Bordeaux Avenue without a warrant.  This misconduct independently amounts to an unreasonable search under the Fourth Amendment.

141.    As a direct and proximate result of Defendants' actions herein, Plaintiffs sustained, and continue to sustain, the injuries and damages set forth above.

**Count V – 42 U.S.C. § 1983**
**Withholding Material Exculpatory and Impeachment Evidence in**
**Violation of the Fourteenth Amendment**

*Against All Defendants*

142.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

143.    *Brady v. Maryland,* 373 U.S. 83 (1963) requires prosecutors to disclose materially exculpatory evidence in the government's possession to the defense, including evidence that goes towards negating a defendant's guilt, evidence that would reduce a defendant's potential sentence, or evidence going to the credibility of a witness.

144.    As described above, Defendants—acting individually and in concert—conspired to hide evidence regarding the relationship between Watkins and Blue, the quid pro quo (campaign contributions to Watkins in exchange for indictment of Plaintiffs), and other "evidence of Watkins's courting the outside influence over the investigatory and charging decisions from parties known to be financially adverse to [Mr.] Hill."

145.    Failure to disclose this evidence deprived Mr. Hill the right to an impartial and disinterested prosecutor in violation of his due process rights.

146.    Had such evidence been disclosed, Plaintiffs would have had cause for immediate dismissal of charges and Plaintiffs would not have had to endure years and years of criminal litigation and resulting tens of millions in legal fees, among other injuries.

147.    As a direct and proximate result of Defendants' actions herein, Plaintiffs sustained, and continue to sustain, the injuries and damages set forth above.

## Count VI – 42 U.S.C. § 1983
### Interference with Family Relationships in Violation of the First and Fourteenth Amendments

*Against All Defendants*

148.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

149.    Plaintiffs are the parents to three children: Albert Galatyn Hill IV, Nance Haroldson Hill, and Caroline Margaret Hill.  The individual Defendants knew that Plaintiffs had children and that the family enjoyed a particularly close relationship.

150.    Hill, Jr., along with the assistance from the other individual Defendants, deliberately targeted Plaintiffs specifically to deprive Plaintiffs of their minor children.  Hill, Jr. wished to retaliate against Mr. Hill, whom he blamed for exposing his perjury in the Hunt Trust

Litigation, and sought to obtain legal custody over Plaintiffs' children (Hill, Jr.'s grandchildren). The other individual Defendants knew or had reason to know that retribution against the Plaintiffs was a driving factor behind their wrongful prosecution of the Plaintiffs.

151.    Apart from Hill, Jr.'s personnel motivation to disband the Plaintiffs' family, the other individual Defendants seized on the potential leverage gained in the BAM litigation (and other civil proceedings).  Defendants Blue, Aldous, and Malouf started a campaign to lobby the Guardian Ad Litem appointed to represent Plaintiffs' children to bolster support for BAM's contingent fee award.

152.    By wrongfully indicting and prosecuting Plaintiffs without probable cause and suppressing exculpatory and impeaching evidence, Defendants intentionally obstructed Plaintiffs' right of familial association with their children and strained their familial relationship.

153.    Defendants' misconduct deliberately violated Mr. and Mrs. Hill's clearly established First and Fourteenth Amendment rights to be free from unwarranted government interference with their familial relationships without due process of law.  By deliberately targeting Plaintiffs, Defendants used the power of the State's executive branch to drive the family apart.  No reasonable government official would have believed that Defendants' actions were lawful.

154.    As a direct and proximate result of Defendants' actions herein, Plaintiffs sustained, and continue to sustain, the injuries and damages set forth above.

### Count VII – 42 U.S.C. § 1983
### Civil Rights Conspiracy

*Against All Individual Defendants*

155.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

156.    Defendants agreed amongst themselves (and with other unknown co-conspirators) to act in concert to deprive Plaintiffs of their clearly established constitutional rights.

157.    As described more fully above, the Defendants, in furtherance of the conspiracy, each engaged in and facilitated numerous overt acts, including but not limited to instituting prosecution of Plaintiffs for the purpose of achieving a favorable outcome in the BAM Litigation and unlawfully exchanging prosecutorial power for campaign donations.

158.    This misconduct was undertaken with malice, willfulness, and reckless indifference to the Plaintiffs' rights.

159.    As a direct and proximate result of Defendants' actions herein, Plaintiffs sustained, and continue to sustain, the injuries and damages set forth above.

160.    This Count is only brought against the individual Defendants in their individual capacities and not brought against any governmental entity or any of the Defendants in their official capacities.

### Count VIII - 42 U.S.C. § 1983
### *Monell* Liability

*Against Defendant Dallas County*

161.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

162.    Defendant Dallas County, by and through its final policymaker—elected District Attorney Watkins, independently and in concert with other DCDA Defendants—had in force and effect during the investigation and indictment of the Plaintiffs and for years before and after, a policy, practice, or custom of unconstitutional misconduct including, in particular, pursuing wrongful investigations, arrests, and prosecutions without probable cause and without due process in exchange for political favors.

163.    Defendant Dallas County, by and through its final policymaker—District Attorney Watkins—had in force and effect during the investigation, indictment, and prosecution of Plaintiffs and for years beforehand, a policy practice, or custom of failing to adequately supervise, discipline, and train District Attorneys investigating and prosecuting criminal charges.

164.    It was widely reported that Watkins used the DCDA's office and grand jury investigations to retaliate against perceived political enemies. He investigated Judge Levario and even two judges who were rumored to agree with her. This environment of intimidation made it impossible for anyone to speak up for Mr. Hill.

165.    Final policymakers for Dallas County had actual or constructive notice of, but repeatedly failed to make any meaningful investigation into charges that District Attorneys used the misconduct described above to pursue criminal charges in return for political favors.  Final policymakers for Dallas County also had actual or constructive notice that widespread failures to supervise or discipline District Attorneys for misconduct committed during the course of criminal investigations and prosecutions enabling District Attorneys to engage in misconduct without repercussion.  The continued adherence to these unconstitutional municipal customs, practices, and/or policies amount to deliberate indifference to the constitutional rights of defendants like the Plaintiffs.

166.    Defendant Dallas County was at all times relevant to this Complaint responsible for the policies, practices, and customs of DCDA which employed the DCDA Defendants during the investigation and prosecution of Plaintiffs.

167.    The constitutional violations in this case were the direct result of the policy, custom, and practice within the DCDA in which political arrests and prosecutions were pursued zealously and without consequence.

168.    The egregious acts of Watkins and the other DCDA Defendants were deliberately ignored by Dallas County as it was well known that the Dallas County District Attorney's office was willing to exchange prosecutorial authority in return for campaign contributions and political clout.  As the final policymaker for Dallas County, Watkins knew that his actions and the actions of his office would be substantially certain to result in constitutional violations including, but not limited to improperly delegating prosecutorial authority, unreasonable searches as seizures absent due process, wrongful indictments and arrests, and malicious prosecutions.

169.    Such unconstitutional municipal customs, practices, and/or policies were the moving force behind Plaintiffs' indictments and prosecutions, as well as all the other grievous injuries and damages set forth above.

### Count IX - 42 U.S.C. § 1983
### Failure to Intervene

*Against DCDA Defendants*

170.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

171.    By their conduct and under color of state law, Defendants Watkins and other DCDA Defendants, acting within the scope of their employment, had opportunities to intervene to prevent other Defendants—including Private Citizen Defendants—from violating Plaintiffs' rights in the manner described above, but with deliberate indifference, declined to do so.

172.    These Defendants' failures to intervene violated Plaintiffs' clearly established constitutional rights not to be deprived property without due process of law as guaranteed by the Fourth and Fourteenth Amendments.  No reasonable criminal prosecutor at the times relevant to this Complaint would have believed that failing to intervene to prevent these constitutional violations were lawful.

173.    The misconduct described in this Count was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights.  The failure to intervene would be related to the administrative or managerial activities of the Defendants, and not subject to any claim or prosecutorial immunity.

174.    The Defendants' failure to intervene was undertaken, at least in part, pursuant to Dallas County's policies and practices in a manner more fully described above.

175.    As a direct and proximate result of Defendants' actions herein, Plaintiffs sustained, and continue to sustain, the injuries and damages set forth above.

## STATE CAUSES OF ACTION

### Count X – Breach of Fiduciary Duty

*Against Defendants Blue, Aldous, and Malouf*

176.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

177.    Hill Jr. began his efforts to obtain indictments of Mr. & Mrs. Hill on February 22, 2010, during the time that the BAM lawyers were representing Mr. & Mrs. Hill.

178.    During that time Blue and the other BAM lawyers became aware of Hill Jr.'s effort to obtain criminal indictments of Mr. & Mrs. Hill in Dallas County, and as their lawyers discussed the matter with Mr. & Mrs. Hill and gave them legal counsel.  Then Blue represented Mr. & Mrs. Hill in that matter by discussing the case with Watkins.

179.    After terminating the representation in October 2010, the BAM lawyers breached their fiduciary duty to Mr. & Mrs. Hill when they undertook to work together and in concert with Hill Jr., his lawyers, Lynn, Gibson, Tillotson, and Pickett, and the DCDA Defendants to obtain

and schedule issuance of the April 1, 2011 indictments of Mr. & Mrs. Hill just days before the scheduled trial of their fee dispute in this court.

180.    On September 8, 2015 Blue filed an *amicus curiae* brief with the Texas Court of Criminal Appeals in which she stated: "Albert Hill III committed the felony crimes of making a false statement to obtain property or credit and securing a document by deception."

181.    As lawyers who agreed to advise and represent Mr. & Mrs. Hill, Blue and the other BAM lawyers owed them a fiduciary duty, including the duty of loyalty.

182.    Mr. & Mrs. Hill placed special confidence in Blue and the other BAM lawyers and in equity and good conscience Blue and the other BAM lawyers were bound to act in good faith and with due regard to the interests of Mr. & Mrs. Hill.

183.    The foregoing actions by Blue and BAM breached fiduciary duties they owed to Mr. & Mrs. Hill, damaging them and entitling them to disgorgement of attorney fees.

184.    As a direct and proximate result of Defendants' actions herein, Plaintiffs sustained, and continue to sustain, the injuries and damages set forth above.

### Count XI—Intentional or Reckless Infliction of Emotional Distress under Texas state law

*Against All Defendants*

185.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

186.    Defendants intentionally, and in breach of their duties owed to Mr. and Mrs. Hill, directly and proximately caused Mr. Hill, an innocent man, to be maliciously indicted, investigated, prosecuted, and publicly humiliated.  Defendants deliberately targeted Mr. Hill for retaliatory purposes and for their own personal gain, and to cause Mr. and Mrs. Hill (and their children) harm, punishment, pain, and suffering.

187.    In particular, the actions of Blue and Watkins when they joined together with Hill Jr., specifically threatening Mr. & Mrs. Hill with prison and the loss of custody of their children, and threatening the children with the loss of their parents and their home, is extreme and outrageous.   The conduct of Hill Jr., Blue, and Watkins is extreme and outrageous, beyond all possible bounds of decency, and would be regarded by an average member of the community as atrocious and intolerable such as to arouse resentment against these Defendants.

188.    As a direct and proximate result of Defendants' actions herein, Plaintiffs sustained, and continue to sustain, the injuries and damages set forth above.

## EXEMPLARY DAMAGES

189.    Plaintiffs hereby incorporate by reference all of the foregoing paragraphs as if restated fully herein.

190.    When viewed objectively from the standpoint of the Defendants, at all times relevant, the conduct complained-of herein involved intentional, malicious, and extreme conduct calculated to cause great harm to the Plaintiffs.

191.    As a direct and proximate result, Plaintiffs are entitled to recover exemplary damages in an amount within the jurisdictional limits of this Court.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, Plaintiffs hereby demand trial to a jury on all issues so triable in this action.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Albert G. Hill, III and Erin N. Hill respectfully pray as follows:

A.  That the Court award compensatory damages to Plaintiffs and against all Defendants, jointly and severally, in an amount to be determined at trial;

B. That the Court award exemplary damages to Plaintiffs, and against all individual

Defendants in their individual capacity, in an amount to be determined at trial, that

will deter such conduct by Defendants in the future;

C. All damages, penalties, remedies, and attorneys' fees as allowed by 42 U.S.C. § 1983,

and as otherwise may be allowed by federal law;

D. All damages, penalties, remedies, and attorneys' fees allowed under Texas state law;

E. Fee disgorgement;

F. For a trial by jury;

G. For pre-judgment and post-judgment interest at the maximum rate allowed;

H. For costs of the Court; and

I. For such other and further relief to which Plaintiffs may be entitled at law or equity.

Dated:  October 26, 2020

THE SKEPNEK LAW FIRM, P.A.                    LATHROP GPM

 /s/*William J. Skepnek*                                      /s/*Robert E. Thackston*
William J. Skepnek; Texas Bar #00790059       Robert E. Thackston
One Westwood Road                             2101 Cedar Springs Road, Suite 1400
Lawrence, KS 66044                            Dallas, TX 75201
785-856-3100                                  Telephone:  469.983.6023
785-856-3099(fax)                             Telecopier:  469.983.6101
bskepnek@skepneklaw.com                       Email:  robert.thackston@lathropgpm.com

**Attorney for Plaintiffs**                   /s/ *Alexander T. Brown*
                                              Alexander T. Brown MO #66637 (*pro hac vice* pending)
                                              2345 Grand Boulevard, Suite 2200
                                              Kansas City, Missouri 64108
                                              Tel: (816) 292-2000
                                              Fax: (816) 292-2001
                                              Alexander.Brown@LathropGPM.com

                                              **Attorneys for Plaintiffs**